UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------- x
VORNADO REALTY TRUST,                          :
ALEXANDER'S INC., ALEXANDER'S OF              :
BROOKLYN, INC., ALEXANDER'S KINGS            :          **OPINION & ORDER**
PLAZA CENTER, INC., ALEXANDER'S              :          08-CV-04823 (DLI) (JO)
KINGS PLAZA, LLC,                              :
                                               :
                        Plaintiffs,            :
                                               :
-against-                                      :
                                               :
CASTLTON ENVIRONMENTAL                        :
CONTRACTORS, LLC, IVI                         :
ENVIRONMENTAL, INC., *et al.*,                 :
                                               :
                        Defendants.            :
-------------------------------------------------------- x
**DORA L. IRIZARRY, U.S. District Judge:**


        Plaintiffs Vornado Realty Trust ("Vornado"), Alexander's Inc., Alexander's of

Brooklyn, Inc., Alexander's Kings Plaza Center, Inc. ("AKPC"), and Alexander's Kings

Plaza, LLC ("AKP"), (collectively, "Plaintiffs"), initiated this action for damages against the

above-captioned defendants, from an oil leak discovered on July 6, 2006 at the Kings Plaza

Shopping Center (the "Site") in Brooklyn, New York.   Plaintiffs seek indemnification,

reimbursement and/or contribution for environmental response costs, compensation for future

environmental investigation and remedial costs, and property damage, as well as declaratory and

injunctive relief requiring further investigation and cleanup of the Site by Defendants.   Before

the court are motions for Summary Judgment pursuant to Federal Rule of Civil Procedure 56(c),

from defendant IVI Environmental, Inc. ("IVI") and defendant Castlton Environmental

Contractors, LLC ("CEC"), (collectively, "Defendants").   Defendants both move to dismiss all

claims and cross-claims against them.   The court also will address the motions for summary

judgment as to the cross-claims Defendants have indicated that they still wish to challenge, as set forth in their respective letters filed in response to the court's May 6, 2011 order to show cause. (*See* Docket Entries Nos. 205, 206.) For the reasons set forth below, the motions for summary judgment as to the claims brought by Plaintiffs are denied, and the motions for summary judgment brought by Defendants as to the cross-claims are denied in part and granted in part.

## BACKGROUND

I.      **State Court Action and the Release**

Pursuant to a Master Agreement dated June 4, 1998 between Vornado, as agent for plaintiffs AKPC, and IVI, IVI performed site investigation and remediation services at the Site, including removal and replacement of existing underground oil storage tanks ("USTs") and the installation of new USTs. (IVI Local Rule 56.1 Statement ("IVI 56.1") ¶¶ 3-4; Plaintiffs' Local Rule 56.1 Statement of Disputed Material Facts ("Pl. 56.1 Regarding IVI") ¶¶ 3-4.) Disputes arose between IVI and Vornado concerning the work IVI was performing, as well as payment for that work, which led to Vornado's termination of the Master Agreement on May 3, 2002. (IVI 56.1 ¶ 6; Pl. 56.1 Regarding IVI ¶ 6.) IVI did not perform any further services at the Site after that date. (IVI 56.1 ¶ 6; Pl. 56.1 Regarding IVI ¶ 6.)

On July 23, 2002, IVI brought an action in the Supreme Court of the State of New York, Kings County ("state court action"), seeking to recover damages against Vornado and AKPC for breach of contract, unjust enrichment and to foreclose its mechanic's lien against the Site. (IVI 56.1 ¶ 18; Pl. 56.1 Regarding IVI ¶ 18; IVI Mot. Ex. 1.) The state court dismissed the action on the grounds that Vornado was acting as the agent of AKPC and did not own the Site. (IVI 56.1 ¶ 19; Pl. 56.1 Regarding IVI ¶ 19.) IVI then filed a Second Amended Complaint in the state court action against AKPC and AKP. (IVI 56.1 ¶ 20; Pl. 56.1 Regarding IVI ¶ 20.) AKPC

and AKP filed counterclaims alleging negligence and breach of the Master Agreement against IVI, based in part on IVI's defective design of the UST system, and IVI's defective design and installation of the ground water treatment system. (IVI 56.1 ¶ 21; Pl. 56.1 Regarding IVI ¶ 21.)

On September 11, 2003, AKPC and AKP signed a "Settlement Agreement and Mutual Releases," (the "Release"), and paid $90,000 to IVI, thereby settling the claims and counterclaims in the state court action. (IVI 56.1 ¶ 22, Ex. 1; Pl. 56.1 Regarding IVI ¶ 22.) A "Stipulation of Discontinuance With Prejudice" was filed in the Kings County Clerk's office on September 30, 2003. (IVI 56.1 ¶ 23; Pl. 56.1 Regarding IVI ¶ 23.)

## II.     Existence of a Slow Leak

IVI alleges that in April 2002, before the Release was signed, Vornado hired Excel Environmental Resources, Inc. ("Excel"), an environmental consulting and engineering firm, to continue the Site remediation work started by IVI. (*See* Mario de Stefanis Affidavit ("De Stefanis Aff.") ¶ 16; Affidavit of Lawra J. Dodge ("Dodge Aff.") ¶ 4; IVI 56.1 ¶ 7; Pl. 56.1 Regarding IVI ¶ 7.) IVI further alleges that, between May 2002 and September 2003, Excel reported to Vornado that "they were recovering fresh oil in the vicinity of the Pump Room, and that there was a possibility that the oil feed pressure line running from the Pump Room to the generators on the roof of [the Site] had a slow leak." (Memorandum of Law Submitted in Support of IVI Environmental, Inc.'s Motion for Summary Judgment ("IVI Mem.") at 3 (citing de Stefanis Aff. ¶¶ 17-28, Ex. 8); *see also* Pl. 56.1 Regarding IVI ¶ 9-11.) IVI asserts that this oil feed pressure line is the line that Plaintiffs allege to be the source of the 2006 leak. (IVI Mem. at 3-4 (citing Affidavit of Lester Gulitz ("Gulitz Aff.") ¶¶ 5-7).) In contrast, Plaintiffs allege that they conducted the appropriate due diligence in response to Excel's report regarding a

possible slow leak, and that due diligence "showed that the UST piping system was not leaking." (*See* Pl. 56.1 Regarding IVI ¶ 13.)

### III.    CEC Involvement and Bankruptcy Action

IVI alleges that it subcontracted the removal and replacement work rendered in connection with the Kings Plaza Shopping Center to Castlton Excavating, Inc., d/b/a Castlton Environmental Contractors, Inc. ("Old Castlton").  (*See* IVI's Rule 56.1 ¶ 4.)  Old Castlton was at that time owned and operated by its parent company, Invatech, Inc. ("Invatech"). (*See* Declaration of William Jacobsen ("Jacobsen Decl.") ¶ 5.)  On or about September 30, 2003, Invatech filed for Chapter 11 bankruptcy protection in the U.S. Bankruptcy Court for the Southern District of New York ("Bankruptcy Court"), and the board of directors filed an application for Chapter 11 bankruptcy protection for Old Castlton and Geo-Con, Inc., which was another company controlled and/or owned by Invatech.  (*See* Jacobsen Decl. ¶ 15.)

CEC's current president, William Jacobsen, was an at-will employee of Old Castlton and, at the time Invatech and Old Castlton filed for bankruptcy protection, Jacobsen held the title of President of the Residential Division of Old Castlton.  (*See* Jacobsen Decl. ¶ 1, 8, 9, 10.) Jacobsen claims that he "was not consulted nor advised of the bankruptcy petitions prior to filing by Invatech's management."   (Memorandum of Law Submitted in Support of Castlton Environmental Contractors, LLC's Motion for Summary Judgment ("CEC Mem.") at 4 (citing Jacobsen Decl. ¶ 16).)  Jacobsen also states that, after learning of the bankruptcy proceedings, he formed Environmental Acquisition Company, LLC ("EAC") for the purpose of submitting a bid to purchase some of the assets from the bankruptcy estate of Old Castlton for use in his new company.  (*See* Jacobsen Decl. ¶¶ 4, 10, 16, 18, 19.)

On April 16, 2004, the Bankruptcy Court issued an Order (the "Sale Order"), approving the sale of certain assets bid on by EAC. (*See* Jacobsen Decl. ¶ 24; Declaration of Keith Hemming, Esq. in Support of CEC's Motion for Summary Judgment ("Hemming Decl. in Support") Ex. C ("Sale Order").) On or about July 15, 2004, the Bankruptcy Court granted a motion to dismiss the debtor's Chapter 11 case and specified that all prior orders shall survive the dismissal of the bankruptcy case. (*See* Hemming Decl. in Support Ex. D.) Jacobsen claims that, in reliance on the Sale Order and order of dismissal, he "transferred the assets purchased by EAC to the newly formed [CEC], whose operations consist of residential UST removals and emergency roadside spill clean-ups." (*See* CEC Mem. at 5 (citing Jacobsen Decl. ¶ 28).)

## LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The court must view all facts in the light most favorable to the nonmoving party, but "only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.* A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## DISCUSSION

**I.     IVI's Motion for Summary Judgment Regarding Plaintiff's Claims**

The parties dispute whether the Release signed by the parties in 2003 should apply to the instant action, thereby barring any further recovery by Plaintiffs here. Specifically, the parties

dispute whether the Release is clear and unambiguous, which, if it were, would prohibit the court from looking outside the four corners of the Release to determine the intent of the parties when signing the Release. Defendants argue that the court should analyze the clear and unambiguous Release only by the language used in the Release and, thus, dismiss Plaintiffs' claims in this action. (*See* IVI Mem. at 4-5; CEC Mem. at 15-17.) In contrast, Plaintiffs argue that the language in the Release is not clear and unambiguous and, therefore, the court must look at external evidence to determine the actual intent of the parties when entering into the Release. (*See* Plaintiffs' Memorandum of Law in Opposition to IVI's Motion for Summary Judgment ("Pl. Opp. to IVI") at 6-8; Plaintiffs' Opposition to CEC's Motion for Summary Judgment ("Pl. Opp. to CEC") at 16.)

If the court finds that the Release is not clear and unambiguous, and, thus, looks to external evidence to determine the intent of the parties, then the parties disagree on their respective intent when signing the Release. In particular, the parties dispute whether they intended the Release to govern services related only to improper *design*, and not improper *installation*, of the UST system, and whether the parties were aware of the existence of a "slow leak" at the time they signed the Release in 2003. Plaintiffs argue that the external evidence reveals material issues of fact, making the determination of intent regarding the Release inappropriate for resolution on summary judgment.

A. *Standard of Law Regarding Interpretation of the Release*

A release is a type of contract governed by principles of contract law. *See Golden Pac. Bancorp v. Fed. Deposit Ins. Corp.*, 273 F. 3d 509, 514 (2d Cir. 2001); *Zilinskas v. Westinghouse Elec. Corp.*, 248 A.D. 2d 777, 778-79 (1998). The court should apply state law to determine the scope and validity of the release, and there is no dispute that New York law applies here.

*See Olin Corp. v. Consol. Aluminum Corp.*, 5 F. 3d 10, 14-15 (2d Cir. 1993). Under New York law, a release must be construed in accordance with the executing parties' intent at the time they executed it. *See Golden Pac. Bancorp*, 273 F. 3d at 515.

"Where a contract is clear and unambiguous on its face, the intent of the parties must be gleaned from within the four corners of the instrument, and not from extrinsic evidence." *RJE Corp. v. Northville Indus. Corp.*, 329 F. 3d 310, 314 (2d Cir. 2003) (citations and internal quotations omitted); *see also Appel v. Ford Motor Co.*, 111 A.D. 2d 731, 732 (2d Dep't 1985) (where a valid release "is clear and unambiguous on its face" and is "knowingly and voluntarily entered into," it "will be enforced as a private agreement between [the] parties"). "Whether a contract is ambiguous is a question of law . . . ." *RJE Corp.*, 329 F. 3d at 314. The terms of a contract are not ambiguous if they "have a definite and precise meaning and are not reasonably susceptible to differing interpretations." *Id.* (citations and internal quotation marks omitted). If the court determines that an agreement is ambiguous, it "may resort to extrinsic evidence to determine the parties' intent[,] . . . so long as the evidence is not inconsistent with the express terms of the contract." *Golden Pac. Bancorp*, 273 F. 3d at 517 (internal citations omitted).

While general releases are governed by principles of contract law, "[their] interpretation and limitation by the parol evidence rule are subject to special rules . . . based on a realistic recognition that releases contain standardized, even ritualistic[] language . . . ." *Mangini v. McClurg*, 24 N.Y. 2d 556, 562 (1969). Thus, courts have avoided general releases with respect to uncontemplated transactions, even where the language in the release form provides general coverage, where the parties are "looking no further than the precise matter in dispute that is being settled." *Id.*; *see also Interpool Ltd. v. Patterson*, 1993 WL 410465, at *11 (S.D.N.Y. Oct. 8, 1993) ("It is well recognized in New York that where 'form' releases are used, the

'standardized, even ritualistic, language' of the 'form' will give way to the parties' actual intent, thus, subordinating the boilerplate terms of the standardized contract." (citing *Mangini*, 249 N.Y. 2d 556)).

B. *Interpretation of the 2003 Release*

At first glance, the language of the Release here is clear and unambiguous. Paragraph 3 states that:

> ALEXANDER'S KINGS PLAZA CENTER, INC., ALEXANDER'S KINGS PLAZA, LLC . . . in consideration of the payment of Ten Dollars ($10.00) and other good and valuable consideration received from IVI ENVIRONMENTAL, INC. as RELEASEE, hereby releases and discharges IVI ENVIRONMENTAL, INC. as the RELEASEE, and RELEASEE'S partners, principals . . . from all actions, causes of action, suits . . . which against the RELEASEES, the RELEASOR, RELEASOR'S heirs, executors, administrators, successors, and assigns ever had, now have or hereafter can, shall or may, have for, upon, or by reason of any matter, cause or thing arising from or relating to services rendered by IVI ENVIRONMENTAL, INC. in connection with the Kings Plaza Shopping Center.

(*See* IVI Mot. Ex. 1.)

Paragraph 6 goes on to say that "[t]his RELEASE is intended to, and does finally and fully terminate and dispose of all claims and demands which have been or may be asserted at law or equity arising from or relating to the services rendered by IVI ENVIRONMENTAL, INC. in connection with the Kings Plaza Shopping Center . . . ." (*See id.*) The Release also states that the signatories of the release "are fully aware of the provisions of this RELEASE and the ramifications thereof," and that "[the] RELEASE may not be changed orally and contains the entire agreement between the parties hereto. The terms of this RELEASE are contractual and not a mere recital." (*See* IVI Mot. Ex. 1 ¶¶ 7, 8.)

However, the Release also includes several "Whereas" statements that reference the claims at issue in the state court action and the parties' desire to specifically settle that action.

(*See id.* at 1-2.)  In particular, the final "Whereas" statement in the Release states that the parties "desire to settle the Kings Plaza Action, including all counterclaims . . . ." (*Id.* at 2.)  These statements imply that, although the Release contains general language releasing the parties from any further liability, the Release was intended to cover the settlement of only those claims at issue in the state court action.  Consequently, the court will look at the extrinsic evidence and circumstances surrounding the Release, in addition to the particular language used in the Release, to determine the intent of the parties at the time they signed it.  *See Mangini*, 24 N.Y. 2d at 562; *Interpool Ltd.*, 1993 WL 410465 at *11.

### C.  Intent of the Parties

The parties here dispute whether they: (i) intended the Release to apply to injuries other than those at issue in the state court action, including whether the Release governs services related only to improper *design*, and not improper *installation*, of the UST system, and (ii) were aware of the slow leak that led to the instant action at the time they signed the Release.  Both parties provide affidavits, testimony and other evidence in support of their respective positions.

i.      Application of the Release to Claims
Not at Issue in the State Court Action

Plaintiffs argue that they only intended the Release to apply to the injuries and claims at issue in the state court action, which were different from those at issue here because the Release governs services related only to improper *design*, and not improper *installation*, of the UST system.  Plaintiffs further argue that they did not intend "the Agreement to include IVI's liability for its faulty installation of the UST piping system."  (Pl. Opp. to IVI at 6.)  In support of their arguments, Plaintiffs submit an affidavit from Daniel R. Lavoie, an attorney for Plaintiffs in the state court matter, in which he references the specific claims and counter-claims asserted in the state court action to support his conclusion that the claims are different from those in the instant

action.  (*See* Lavoie Aff. ¶¶ 13-16.)  Specifically, Mr. Lavoie points out that the state court action involved claims that IVI improperly *designed* the UST system, and did not involve any claims against IVI regarding faulty or negligent *installation* of the UST system.  (*Id.*)  Plaintiffs also submit an affidavit from Albert J. Zubcak, Vice President of Operations for Plaintiffs and Plaintiffs' representative in the state court action, in which Mr. Zubcak supports Plaintiffs' assertion that their intent in entering the Release was to settle claims against IVI only for issues raised in the state court action, which Mr. Zubcak describes as "essentially a billing dispute between the parties."  (Affidavit of Albert J. Zubcak ("Zubcak Aff.") ¶¶ 9-13, 25.)  Mr. Zubcak's assertions in his affidavit also support Mr. Lavoie's contention that the state court action involved only claims that IVI improperly *designed* the UST system and did not involve claims of improper *installation*.  (*Id.* at ¶¶ 6-9; *see also id.* at ¶¶ 15, 22.)

Defendants disagree, and argue that the Release clearly indicates the parties' intent to release the parties from the instant claim because the claims here are the same as the counterclaims in the first action, and no distinction between defective design and installation was made in the language of the Release or intended by the parties.  (*See* Gulitz Aff. ¶¶ 8-10 (citing IVI Mot. Ex. 17 ¶¶ 49, 58, 73, 79, Ex. 18, Ex. 19 ¶¶ 21, 48.)  IVI urges the court to rely on the clear language of the Release to find that the Release applies to the instant action.  (IVI Mem. at 4-7; *see also* IVI Mot. Ex. 1 ¶ 6 (the Release states that it "is intended to, and does finally and fully terminate and dispose of all claims and demands which have been or may be asserted at law or equity arising from or relating to the services rendered by [IVI] in connection with the Kings Plaza Shopping Center . . . .").)

A review of the amended complaint in the state court action indicates that the counterclaims asserted by Plaintiffs against IVI in the state court action only explicitly refer to

improper *design* of the UST system, not improper *installation* of the UST system.  Although Plaintiffs arguably should have included exception language in the Release or made clear in the Release that it only applied to the claims and injuries at issue in the state court action, the "Whereas" language in the Release and affidavits submitted by Plaintiffs in opposition to IVI's summary judgment motion here, as well as the affidavits submitted by Plaintiffs, indicate that their intent may have been for the Release to apply only to the injuries at issue in the state court action.  Thus, after taking into account the language of the Release and the external evidence provided by the parties, it is clear that there are issues of material fact improper for determination on summary judgment as to whether the parties intended the Release to apply only to injuries at issue in the state court action, and whether the parties intended for the Release to govern services related to both improper design *and* installation of the UST system.

   ii.  <u>Parties' Knowledge of the Slow Leak</u>

   IVI further contends that, at the time they signed the Release, Plaintiffs were aware of the slow leak that led to the instant claims.  As such, IVI maintains that, because the parties did not include any exception language in the Release indicating that the Release would not govern claims arising from the slow leak, they clearly intended for the Release to include such claims.  In support of its position, IVI submits an affidavit from Mario de Stefanis, Vice President of IVI, in which Mr. de Stefanis states that Excel's monthly progress reports show that a slow leak existed and further testing should be done.  (*See* de Stefanis Aff. ¶¶ 19-20.)  IVI further relies on a June 20, 2002 email from Lawra J. Dodge, President of Excel, addressing extra oil in one of the wells and stating that, based on the volume of oil in the well, Excel proceeded to re-evaluate the potential for other sources of ongoing discharge.  (*See* de Stefanis Aff. ¶ 21, 22; IVI Mem. Ex. 8.)  The email also states that Plaintiffs "could potentially have . . . a slow leak," but that Excel

could not be certain of the source of the oil without testing the piping from the USTs to the pump room. (*See id.*) A subsequent fax on May 24, 2002 from Ms. Dodge to Mr. Zubcak indicates that the oil taken from the area was "fresh," and an August 26, 2002 email from Ms. Dodge to Mr. Zubcak states that "[a]ctive oil recovery [was] continuing." (*See* de Stefanis Aff. ¶ 23, 25; IVI Mem. Exs. 9, 11.) IVI states that "[t]he oil feed pressure line alleged by [P]laintiffs to be the source of the 2006 oil leak is the same oil feed pressure line that Excel's June 20, 2002 email to Vornado (Exhibit "8"), warned [P]laintiffs about, as possibly having a 'slow leak'." (*See* Gulitz Aff. ¶ 7.)

In contrast, Plaintiffs argue that the evidence provided by Defendants is not sufficient to show, as a matter of law, that both parties were aware of the slow leak at the time they signed the Release. Plaintiffs assert that they did not know at the time of the execution of the Release that there was anything wrong with the UST piping system and that they never contemplated releasing IVI from any issues associated with such a defect in installation of the UST system. (*See* Plaintiff's 56.1 Regarding IVI at ¶ 25; Andrew J. Perel Affidavit ("Perel Aff.") ¶ 7.) Instead, Plaintiffs argue that Ms. Dodge was merely being overly cautious and speculating in her June 20, 2002 email. (*See also* Dodge Aff. ¶ 17 (Ms. Dodge states that she sent the June 20, 2002 email only "[o]ut of an abundance of caution" and that the email merely "speculated about the possibility of other sources.").) Furthermore, Plaintiffs allege that although Excel's reports indicated that there was more than usual oil accumulation and recovery at the Site, "after their appropriate due diligence showed that the UST piping system was not leaking, [Plaintiffs] had no reason to believe that there was a problem with the UST piping system at that time." (Pl. 56.1 Regarding IVI ¶ 13; *see also* Dodge Aff. ¶ 19; IVI Mot. Ex. 7 at 9-10, Ex. 10 at 10-11.) In further support of their position, Plaintiffs argue that "[i]t is inconceivable to believe that

Plaintiffs would agree to *pay IVI $90,000* to settle the state court action and its counterclaims had they known that IVI's negligence and other failures at the Site would result in catastrophic failure of the UST piping system and the resulting damages they have now suffered." (*See* Plaintiff's Opposition at 10.)

Plaintiffs provide affidavits from several parties with knowledge of the circumstances surrounding the Release. Ms. Dodge submitted an affidavit in which she states that there was no "slow leak" in the UST piping system at the time the Release was signed, and Excel had no reason to believe IVI and its subcontractors improperly installed the UST system which would later cause the oil leak that is the subject of this action. (Dodge Aff. ¶¶ 8, 24.) Ms. Dodge states that, "[h]ad there been a 'slow leak' as IVI claims, the test results reported in Monthly Progress Report No. 16[, (*see* IVI Mot. Ex. 10),] would have revealed such a leak. They did not." (Dodge Aff. ¶ 22.) In addition, Mr. Zubcak states that Plaintiffs had no reason to believe installation of the UST system was faulty during the state court action, and Excel's tests concluded that the UST piping system was tight and not leaking. (Zubcak Aff. ¶¶ 14, 15, 18, 19.) Andrew J. Perel, an attorney for Plaintiffs, states that, even after conducting its due diligence, Plaintiffs did not have any information or belief that the installation of the UST system had a slow leak or was otherwise faulty at the time of the state court action or subsequent settlement. (*See* Perel Aff. ¶¶ 11, 13, 14, 15, 16; *see also* William A. Baker ("Baker Aff.") ¶ 11.) Furthermore, Plaintiffs point to various Excel Monthly Progress reports which indicate that no on-going leaks were occurring at the time of the state court action. (*See* Dodge. Aff. ¶¶ 25, 26.)

The affidavits, testimony and other evidence provided by the parties demonstrate that there are issues of material fact regarding whether the parties intended the Release to release the parties from liability for damages related to improper installation of the UST system, instead of

only defective design, and from the slow leak which allegedly caused the damages in the instant action. Consequently, the intent of the parties in entering the Release and, accordingly, whether the Release prevents any liability by Defendants in the instant action, is not proper for determination on a motion for summary judgment.[1] *See Golden Pac. Bancorp*, 273 F. 3d at 515 ("Where contract language is ambiguous, the differing interpretations of the contract present a triable issue of fact.") (citations and internal quotation marks omitted); *Interpool, Ltd.*, 1993 WL 410465, at *11 ("in construing the scope and meaning of a release under New York law, consideration must be given to the intent of the parties, which is a question of fact that cannot be decided on a motion for summary judgment").

## II.    IVI's Motion for Summary Judgment Regarding Defendants' Cross-claims

Pursuant to IVI's May 17, 2011 letter filed with the court in response to the court's May 6, 2011 order to show cause, IVI's motion for summary judgment with respect to all co-defendants' cross-claims are moot, with the exception of the cross-claim by CEC against IVI.[2] (*See* Docket Entry No. 205.) Thus, the court will address IVI's summary judgment motion only with respect to the cross-claims for indemnification and contribution brought by CEC against IVI. (*See* Docket Entry No. 138.)

---

[1] Plaintiff makes several additional arguments for denial of IVI's motion for summary judgment, including lack of consideration for the Release and mutual mistake by the parties in entering the Release. The court need not address these arguments because, as discussed in this Section, it denies IVI's motion for summary judgment as to Plaintiffs' claims.

[2] As IVI has indicated that the cross-claims brought by co-defendants Dover Corp. and OPW Fueling Components, Inc. are moot, the letters submitted by those co-defendants and Plaintiffs regarding new arguments raised in IVI's Reply need not be addressed by the court. (*See* Docket Entry No. 158, 159, 160.)

*A.  Common Law Contribution*

IVI argues that, pursuant to N.Y. GEN. OBLIGATIONS LAW § 15-108(b), IVI is not liable to any other defendant under a common law contribution theory given the Release from Plaintiffs.  (*See* IVI Mem. at 8-9.)  However, N.Y. GEN. OBLIG. LAW § 15-108 clearly bars a co-defendant's contribution claim only if the release at issue is for the *same injury* the plaintiff alleged against the non-settling co-defendant.  *See* N.Y. GEN. OBLIGATIONS LAW § 15-108; N.Y. C.P.L.R. § 1404.  This court has found that there exists an issue of material fact as to whether the Release applies to the injury at issue here.  Thus, the court cannot grant summary judgment as to cross-claims for common-law contribution made against IVI.  (*See supra* Discussion Section I.)  Furthermore, CEC provides no evidence or factual support for its claim of contractual contribution.  Therefore, CEC's cross-claim for contractual contribution from IVI is dismissed.

*B.  Indemnification Claims*

IVI next argues that IVI cannot be required to indemnify CEC because the doctrine of indemnification cannot be invoked where the party seeking to be indemnified has itself participated in any of the wrongdoing claimed by the plaintiff, and IVI is not charged vicariously for the acts of CEC or any other defendant.  (IVI Mot. at 11-12.)  IVI further argues that it did not enter into any contracts or agreements with parties in this case other than Vornado, as the agent for AKPC and AKP, that require IVI to indemnify and/or provide liability insurance coverage for CEC.  (*Id.* at 12-13.)

In contrast, CEC argues that summary judgment as to its cross-claim for indemnification against IVI should be denied because IVI entered into a subcontract with Old Castlton regarding Old Castlton's alleged work at the Site, (*see* Declaration of Keith Hemming, Esq. in Opposition

to IVI's Motion for Summary Judgment ("Hemming Decl. in Opp."), Exs. A, B, C), and further discovery is required as the project documentation indicates that IVI "(1) dictated the methods of construction used by [Old Castlton]; and (2) performed final inspections and testing of [Old Castlton's] work, subject to further revisions directed by IVI," (CEC Opp. to IVI at 8 (internal quotations omitted)).

"Under New York law, a claim for indemnification arises only under an express contract of indemnification, or where one defendant is held vicariously liable for the negligence of another" through the existence of a relationship between the defendant and the actual wrongdoer, such as that of employee and employer. *Resolution Trust Corp. v. Young*, 925 F. Supp. 164, 169 (S.D.N.Y. 1996); *see also King v. Audax Constr. Corp.*, 2007 WL 2582103, at *11 (E.D.N.Y. Sept. 5, 2007); *Sherleigh Assoc., Inc. v. Patron Sys., Inc.*, 2005 WL 1902844, at *2 (S.D.N.Y. 2005). A claim for common law indemnification may also be established by proving that the claimant was not guilty of any negligence and the proposed indemnitor "had the authority to direct, supervise and control the work giving rise to the injury." *Perri v. Gilbert Johnson Enter., Ltd.*, 14 A.D. 3d 681, 684-85 (2d Dep't 2005). The Second Department explained that:

> To establish a claim for common-law indemnification, 'the one seeking indemnity must prove not only that it was not guilty of any negligence beyond the statutory liability but must also prove that the proposed indemnitor was guilty of some negligence that contributed to the causation of the accident[,]' . . . *[o]r[,] 'in the absence of any negligence[,]' that the proposed indemnitor 'had the authority to direct, supervise, and control the work giving rise to the injury.'* Where the proposed indemnitee's liability is purely statutory and vicarious, conditional summary judgment for common-law indemnification against a proposed indemnitor is premature absent proof, as a matter of law, that the proposed indemnitor 'was either negligent *or exclusively supervised and controlled plaintiff's work site.*'

*Id.* (citations omitted, emphasis added).

Although there is an indemnity provision in the contract agreement, it states only that Old Castlton as the contractor will indemnify IVI under certain circumstances. There is no provision that states IVI will indemnify CEC.[3] CEC has made no further showing of a right to contractual indemnification, thus, its cross-claim for contractual indemnification is dismissed.

However, although CEC fails to cite to any case law in support of its argument regarding a valid claim for indemnification based on IVI's direction of Old Castlton's work, it submits the Request for Proposals ("RFP")[4], (*see* Hemming Decl. in Opp. Ex. A), which at least creates a material issue of fact as to whether IVI directed, supervised or controlled Old Castlton's work that gave rise to the injuries at issue here. Furthermore, as discussed below, there remains an issue of fact as to whether IVI is negligent for the injuries at issue here and whether CEC can be held liable as a successor in interest to Old Castlton. Thus, there are material issues of fact as to the requirements to establish a claim for common law indemnification. Accordingly, summary judgment as to CEC's cross-claims of common law indemnification is denied.[5]

---

[3] Even if the provision provided that IVI would indemnify Old Castlton, as discussed *infra* at Section III, there remains an issue of material fact as to whether CEC is a successor in interest to Old Castlton. Thus, it cannot be determined on the record before this court whether CEC would have the benefit of a contract providing contribution or indemnification by IVI that existed between IVI and Old Castlton.

[4] The RFP was accepted by IVI via a letter dated July 24, 2000, (*see* Hemming Decl. in Opp. Ex. B), and the terms of the RFP were incorporated into the contract agreement entered into between IVI and Old Castlton, (*see id.* Exs. B, C).

[5] IVI also moves to have CEC's cross-claim for breach of contract dismissed. However, there is no indication in CEC's answer that it asserts a breach of contract claim separate and apart from its claims of contractual indemnification and contribution. (*See* Docket Entry No. 138.) Accordingly, the court will not address a separate breach of contract claim in this Memorandum and Opinion.

**III.     CEC's Motion for Summary Judgment Regarding Plaintiff's Claims**

CEC argues that Plaintiffs' claims against CEC should be barred because Old Castlton, not CEC, performed the work at issue, and CEC cannot be held liable for any services provided by Old Castlton because CEC is not a successor in interest to Old Castlton. CEC argues that it is not a successor in interest to Old Castlton because the Sale Order between CEC and Old Castlton shows that CEC purchased the assets from Old Castlton free and clear of all liabilities and, alternatively, because New York common law's exceptions to the rule of no liability cannot be satisfied. CEC claims that it did not merge with Old Castlton, nor is it a continuation of Old Castlton, because there is no continuity of ownership, the work conducted by each company is different, not all assets from Old Castlton were purchased from CEC, there was no assumption of liabilities by CEC, there was no continuation of management, there was no assumption of office leases and some, but not all, personnel from Old Castlton joined CEC. (*See* CEC Mem. at 5-6 (citing Jacobsen Decl. at ¶ 28).) Plaintiffs disagree. Instead, they contend that the Sale Order does not bar a finding of successor liability against CEC here and there are issues of fact as to whether CEC is a successor in interest to Old Castlton.

*A.   Sale Order*

CEC maintains that the Sale Order provided by the Bankruptcy Court expressly prohibits all claims against CEC in this litigation because it precludes any successor liability claims against CEC. Moreover, Mr. Jacobsen states that his purchase of Old Castlton "was contingent on receiving the equipment free and clear of any and all liabilities of Old Castlton," (Jacobsen Decl. ¶ 24), and that he "would have <u>never</u> purchased any assets from the bankruptcy . . . without being assured by the Bankruptcy Court's Sale Order that [he] was protected from these potential liabilities, (*id.* ¶¶ 26, 27). In contrast, Plaintiffs argue, *inter alia*, that the Sale Order does not

preclude a finding that CEC is a successor in interest to Old Castlton.  The court agrees with Plaintiffs.[6]

Even if Bankruptcy Courts are empowered to "sell assets free and clear of all successor liability claims," (*see* CEC Mem. at 7-9), it does not mean that Bankruptcy Courts are *required* to do so.  The language of the Sale Order states that the transfer of assets will not subject the purchaser to any liability for claims against the debtor or assets *by reason of such transfer*, and the "[p]urchaser shall not be deemed, *as a result of any action taken in connection with the acquisition of the [p]urchased [a]ssets* to: (a) be a successor to the [d]ebtors, (b) have, *de facto* or otherwise, merged with or into the [d]ebtors, or (c) be a continuation or substantial continuation of the [d]ebtors or any enterprise of the [d]ebtors." (*See* Sale Order at 9 (emphasis added).)  Thus, the plain language of the Sale Order here simply prevents CEC from being: (i) held liable merely *by reason of* the transfer; and (ii) deemed to be a successor, merged entity or continuation of Old Castlton merely *as a result of* the purchase.  The Sale Order does not, however, prevent CEC from being deemed to be a successor, merged or continuation of Old Castlton for other reasons.

While public policy favors allowing "free and clear" sales where the "free and clear" nature of the sale was an inducement of the sale's success, the Sale Order here does not prohibit CEC's liability as a successor in interest, merger or continuation of Old Castlton.  Thus, the Sale Order does not bar CEC from being liable as a successor in interest to Old Castlton for reasons other than merely as a result of CEC's purchase of Old Castlton.  Consequently, the court must

---

[6] Although Plaintiffs also argue that collateral estoppel prevents a finding that the Sale Order prohibits successor liability, this court need not decide whether collateral estoppel applies because it finds that the Sale Order does not prohibit successor liability here.  The court also need not address Plaintiffs' argument regarding lack of notice of the Sale Order, because the court finds that the Sale Order does not, in and of itself, prohibit successor liability here.

look at the specific circumstances underlying this action to determine whether successor liability can be established against CEC.

### B.  Successor Liability

"[A] corporation that purchases the assets of another corporation is generally not liable for the seller's liabilities." *State of New York v. Nat'l Serv. Indus., Inc.*, 460 F. 3d 201, 209 (2d Cir. 2006).  However, there are several exceptions to this rule, including if the: (1) buyer of the corporation's assets expressly or impliedly assumed the predecessor's liability; (2) transaction could be viewed as a *de facto* merger or consolidation; (3) acquiring company is a mere continuation of the selling company; or (4) transaction is entered into fraudulently to escape liabilities.  *Id.*  The parties appear to agree that neither the first nor the fourth exception applies here.

"The mere continuation exception applies where 'it is not simply the business of the original corporation which continues, but the corporate entity itself' and there is a 'common identity of directors, stockholders, and the existence of only one corporation at the completion of the transfer.' " *Silverman Partners LP v. Verox Grp.*, 2010 WL 2899438, at *5 (S.D.N.Y. Jul. 19, 2010).  "Thus, the underlying theory of the exception is that [] if [a] corporation goes through a mere change in form without a significant change in substance, it should not be allowed to escape liability." *Id.* (citations omitted).

To determine whether there has been a *de facto* merger, the court may consider whether there was:  "(1) continuity of ownership; (2) cessation of ordinary business and dissolution of the acquired corporation as soon as possible; (3) assumption by the purchaser of the liabilities ordinarily necessary for the uninterrupted continuation of the business of the acquired corporation; and (4) continuity of management, personnel, physical location, assets, and general

business operation." *Nat'l Serv. Indus.*, 460 F. 3d at 209. Although not all of these factors need to be present, "'continuity of ownership is the essence of a merger' and therefore the exception cannot apply in its absence." *Douglas*, 363 F. App'x at 102 (quoting *Nat'l Serv. Indus.*, 460 F. 3d at 211); *see also Cargo Partner*, 352 F. 3d at 46; *In re New York City Asbestos Litig.*, 15 A.D. 3d 254, 256 (1st Dep't 2005).

"Some courts have observed [that] the mere-continuation and de-facto-merger doctrines are so similar that they may be considered a single exception." *Cargo Partner AG v. Albatrans, Inc.*, 352 F. 3d 41, 45 n.3 (2d Cir. 2003); *see also Douglas v. Stamco*, 363 F. App'x 100, 102 (2d Cir. 2010). Other courts, however, have differentiated between *de facto* merger and mere continuation. *See e.g. Ladjevardian v. Laidlaw-Coggeshall, Inc.*, 431 F. Supp. 834, 838-39 (S.D.N.Y. 1977). The court need not resolve here whether the *de facto* merger and mere continuation exceptions are the same or distinct theories, because there remain issues of fact as to whether CEC was a continuation of Old Castlton under either exception.

The parties disagree whether there was any continuity of ownership between CEC and Old Castlton. CEC argues that neither the *de facto* merger exception nor the mere continuation exception applies here because CEC's owner had no ownership interest in Old Castlton and took no part in decisions regarding the bankruptcy petition, not all assets of Old Castlton were purchased by CEC, the management is different, the work is different, some of the employees are different, and there was no assumption of liabilities or offices. (*See* CEC Mem. at 12-14; Jacobsen Decl. ¶¶ 4, 28.) Mr. Jacobsen, CEC's President, states that he was always an "at-will" employee of Old Castlton, and did not own any stock or have an ownership interest in any debtor company listed in the bankruptcy petition. (*Id.* ¶ 10, 11.) Mr. Jacobsen also states that "[t]he type of work described by Plaintiffs in the amended complaint is commercial in nature and

therefore outside the scope of [his] employment with Old Castlton as a residential specialist." (*Id.* ¶ 14.)

In contrast, Plaintiffs argue that CEC was merely a continuation of Old Castlton because CEC is performing the same business of UST installation and removal, and emergency spill response as Old Castlton. (*See* Lavoie Aff. ¶¶ 26, 36.) "Indeed [CEC] subsequently used the same address, same employees, same trade name, and same advertisements as [Old Castlton]. [CEC] also purchased insurance covering the liabilities of [Old Castlton]." (*Id.*; *see also* Pl. Opp. to CEC Ex. 1.) Plaintiffs also allege that Old Castlton was sold to CEC as a going concern, (*see* Lavoie Aff. ¶ 38), CEC and Old Castlton had the same management, (*see id.*), and although CEC has added and removed some employees since 2003, CEC continues to use the same corporate address that Old Castlton used, (*see* Lavoie Aff. ¶ 51).

Furthermore, Plaintiffs assert that CEC held itself out as having been in business since 1981 and declared in an advertisement that it had been in business for over 20 years. (*See* Lavoie Aff. ¶¶ 33, 34; *see also* Pl. Opp. to CEC Ex. 1.) Plaintiffs argue that these public actions taken by CEC confirm that it views itself as a continuation of CEC. Plaintiffs also provide evidence that CEC purposely availed itself of Old Castlton's goodwill by using Old Castlton's name and letterhead, and by placing Old Castlton on a CEC insurance policy as an insured. (*See* Lavoie Aff. ¶ 40-41; Plaintiff's Ex. 1, Lavoie Decl. ¶ 10-11, Exs. H, I.)

Even Mr. Jacobsen's own affidavit and testimony indicate that there is at least an issue of material fact as to whether there was continuity between CEC and Old Castlton. Mr. Jacobsen states that he was President of the Residential Division of Old Castlton since 2001, (*see* Jacobsen Decl. ¶ 8), and that CEC is engaged in UST installation, removal and emergency spill response, (*see* Declaration of Gregory S. Hoffnagle in Support of Opposition to CEC's Motion for

Summary Judgment ("Hoffnagle Decl.") Ex. C ("Jacobsen Dep. Tr.") at 39:22-40:8). He also testified during his deposition that he "took like 70 percent" of the employees from Old Castlton to work at CEC. (*See* Jacobsen Dep. Tr. at 66:4-68:10.) In addition, CEC's Disclosure Statement filed in the Bankruptcy Case arguably shows that Old Castlton was sold as a going concern and that CEC is performing the same business as Old Castlton. (*See* Plaintiff's Ex. 8 at 2, 11.) There is no indication that Old Castlton survived the asset sale.

The facts discussed above demonstrate that there are material issues of fact as to whether there was continuity between CEC and Old Castlton and, thus, whether CEC was a mere continuation of, or *de facto* merger with, Old Castlton. Consequently, this court cannot find, as a matter of law, that CEC cannot be held liable as Old Castlton's successor in interest.

### C. *Release Does Not Bar CEC's Liability*

CEC also claims that the Release is valid and releases Old Castlton from any liability associated with the Kings Plaza project. The court has determined that there are material issues of fact regarding the applicability of the Release to the instant action, (*see supra* Discussion Section I), thus, the court cannot release Old Castlton or CEC from liability based on the Release. As a result, the court need not determine whether the Release extends to Old Castlton.

## IV. Cross-claims against CEC

CEC states in its May 19, 2011 letter that the cross-claims asserted against CEC by defendants OPW Fueling Containment Systems, Inc. and HOP Energy, LLC, d/b/a Madison Oil are moot. (*See* Docket Entry No. 206.) CEC also requests all cross-claims asserted against CEC by settling defendants IVI, Dover Corp. and Marubeni Sustainable Energy, Inc., a/k/a DG Energy Solutions, LLC, DG Investors, LLC, DG Kings Plaza, LLC, be dismissed "[i]n the event [that] CEC's motion for summary judgment is granted." (*See id.*) As this court denies CEC's

motion for summary judgment with respect to Plaintiffs' claims against CEC, it need not address

CEC's motion for summary judgment as to the cross-claims made against CEC.


## **CONCLUSION**

For the aforementioned reasons, Defendants' respective motions for summary judgment

are denied, with the exception of IVI's motion as to CEC's cross-claims for contractual

contribution and contractual indemnification from IVI, which are granted.


SO ORDERED.

Dated: Brooklyn, New York
         September 30, 2011

                                    _____
                                                /s/
                                        DORA L. IRIZARRY
                                     United States District Judge