UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
VORNADO REALTY TRUST, ALEXANDER'S INC., :
ALEXANDER'S OF BROOKLYN, INC., :
ALEXANDER'S KINGS PLAZA CENTER, INC., : **DECISION AND ORDER**
COMMERCE AND INDUSTRY INSURANCE : 08-CV-4823 (WFK) (JO)
COMPANY a/s/o ALEXANDER'S KINGS PLAZA, :
LLC, :
 :
                Plaintiffs, :
 :
  -against- :
 :
MARUBENI SUSTAINABLE ENERGY, INC. a/k/a :
DG ENERGY SOLUTIONS LLC, DG INVESTORS, :
LLC, DG KINGS PLAZA LLC, CASTLTON :
ENVIRONMENTAL CONTRACTORS, LLC :
ENVIRON PRODUCTS, INC., HESS CORPORATION, :
EMCOR GROUP, INC., d/b/a PENGUIN ELECTRIC, :
HOP ENERGY, LLC, d/b/a MADISON OIL; IVI :
ENVIRONMENTAL, INC.; ENVIRON :
HOLDINGS; DOVER CORPORATION; OPW :
FUELING COMPONENTS, INC.; VARIOUS :
JOHN DOES; JANES DOES; and XYZ COMPANIES, :
 :
                Defendants. :
 :
------------------------------------------------------------------X
**WILLIAM F. KUNTZ, II, United States District Judge**

Vornado Realty Trust ("Vornado"), Alexander's Inc., Alexander's of Brooklyn, Inc.,

Alexander's Kings Plaza Center, Inc. ("AKPC"), and Commerce and Industry Company a/s/o

Alexander's Kings Plaza, LLC ("AKP") (collectively, "Plaintiffs"), initiated this action for

damages against the above-captioned defendants based on an oil leak discovered on July 6, 2006

at the Kings Plaza Shopping Center ("the Site") in Brooklyn, New York. Plaintiffs seek to

recover from the named defendants clean-up and remediation costs allegedly resulting from the

1

leak. On September 30, 2011, the Court denied motions for summary judgment brought by Defendant IVI Environmental Inc. ("IVI") and Defendant Castlton Environmental Contractors, LLC ("CEC") (collectively, "Defendants"). On November 16, 2011, the Court denied Defendants' respective motions for reconsideration. Before the Court are Defendants' Renewed Motions for Summary Judgment pursuant to Federal Rule of Civil Procedure 54(b). For the reasons set forth below, the Court grants Defendants' Renewed Motions for Summary Judgment and directs the Clerk of Court to enter judgment in favor of Defendants.

## BACKGROUND

### I. The State Court Action and the Release

Pursuant to a "Master Agreement" dated June 4, 1998, with Vornado, as agent for AKPC and AKP, IVI agreed to perform certain site investigation and remediation services at the Site, including the replacement of existing underground soil storage tanks ("USTs") and the installation of new USTs. IVI 56.1 St. at ¶ 1. On May 3, 2002, Vornado terminated the Master Agreement and revoked all permission for IVI to access the Site. *Id.* at ¶ 2.

On July 23, 2002, IVI commenced an action in the Supreme Court of the State of New York, County of Kings ("the State Court Action"), seeking to recover damages from Vornado and AKPC for breach of contract, unjust enrichment, and to foreclose its mechanic's lien against the Kings Plaza Shopping Center. *Id.* at ¶ 3. AKPC and AKP interposed counterclaims against IVI based, in part, upon their allegation that IVI's groundwater treatment system was designed and installed incorrectly. *Id.* at ¶ 4; Decl. of Joseph P. McNulty ("McNulty Decl.), Ex. H.[1] On July 21, 2003, the claims and counterclaims in the State Court Action were compromised and settled. IVI 56.1 St. at ¶ 5. AKPC and AKP executed a "Settlement Agreement and Mutual

---

[1] IVI submitted two Declarations of Joseph P. McNulty in support of its renewed motion for summary judgment, each including its own set of exhibits. Unless otherwise specified, citations to "McNulty Decl." refer to the second of the two declarations and its attendant exhibits. *See* Dkt. No. 296-15.

2

Releases" (the "Release"), and paid $90,000 to IVI. *Id.* at ¶ 6. Mario De Stefanis signed the release on behalf of IVI, and Joseph Macnow signed the Release on behalf of AKP and AKPC. McNulty Decl., Ex. F. A Stipulation of Discontinuance With Prejudice was filed in the Kings County Clerk's Office on September 30, 2003. *Id.* at ¶ 7.

The Release states, in pertinent part:

WHEREAS, on or about February 7, 2003, ALEXANDER'S KINGS PLAZA CENTER, INC. and ALEXANDER'S KINGS PLAZA, LLC served an answer and counterclaims to the second amended complaint by IVI ENVIRONMENTAL, INC., which counterclaims seek to recover damages for breach of contract, negligence, malpractice and conversion from IVI ENVIRONMENTAL, INC.; and

WHEREAS, IVI ENVIRONMENTAL, INC., ALEXANDER'S KINGS PLAZA CENTER, INC., ALEXANDER'S KINGS PLAZA, LLC and FIDELITY AND DEPOSIT COMPANY OF MARYLAND desire to settle the Kings Plaza Action, including all counterclaims, and discharge and cancel the Bond.

\*\*\*

3. ALEXANDER'S KINGS PLAZA CENTER, INC., ALEXANDER'S KINGS PLAZA, LLC and FIDELITY AND DEPOSIT COMPANY OF MARYLAND, for themselves and for their predecessors and successors in interest, affiliates, principals, directors, officers, shareholders, partners, members, managing members, agents, employees and assigns . . . hereby releases and discharges IVI ENVIRONMENTAL, INC . . . and [IVI's] . . . agents . . . from all actions, causes of action, suits, debts, sums of money, accounts, reckonings, bills, bonds, specialties, contracts, covenants, controversies, agreements, promises, variances, trespasses, judgments, damages, executions, claims and demands whatsoever, in law, admiralty or equity, which against the RELEASEES, the RELEASOR, RELEASOR'S heirs, executors, administrators, successors, and assigns ever had, now have or hereafter can, shall or may, have for, upon, or by reason of any matter, cause or thing arising from or relating to services rendered by IVI ENVIRONMENTAL, INC. in connection with the Kings Plaza Shopping Center.

4. It is hereby mutually understood and agreed that this settlement is a compromise of disputed claims and is not to be construed or interpreted in any way as an admission of liability on the part of ALEXANDER'S KINGS PLAZA CENTER, INC., ALEXANDER'S KINGS PLAZA, LLC and FIDELITY AND DEPOSIT COMPANY OF MARYLAND or by IVI

> ENVIRONMENTAL, INC. on the counterclaims, such liability and/or responsibility being hereby expressly denied.

***

> 6. This RELEASE is intended to, and does finally and fully terminate and dispose of all claims and demands which have been or may be asserted at law or equity arising from or relating to the services rendered by IVI ENVIRONMENTAL, INC. in connection with the Kings Plaza Shopping Center, including all attorneys' fees and expenses that the parties may have incurred to date.
>
> 7. The signatories of this RELEASE hereby specifically state that they have executed this RELEASE voluntarily and are fully aware of the provisions of this RELEASE and the ramifications thereof.
>
> 8. This RELEASE may not be changed orally and contains the entire agreement between the parties hereto. The terms of this RELEASE are contractual and not a mere recital.

McNulty Decl., Ex. F.

## II. CEC's Involvement and the Bankruptcy Action

IVI subcontracted removal and replacement work to Castlton Excavating, Inc. d/b/a Castlton Environmental Contractors, Inc. ("Old Castlton") at the Kings Plaza Shopping Center. CEC 56.1 St. at ¶ 1. Old Castlton was owned and operated by a parent company, commonly known as Invatech, Inc. ("Invatech"). *Id.* at ¶ 6. On or about September 30, 2003, Invatech filed for Chapter 11 bankruptcy protection in the U.S. Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), and the board of directors filed an application for Chapter 11 bankruptcy protection for Old Castlton. *Id.* at ¶¶ 7–8.

Environmental Acquisition Company, LLC ("EAC") submitted bids to the Bankruptcy Court and, on April 16, 2004, the Bankruptcy Court issued an Order ("the Sale Order"), approving the sale of certain assets bid on by EAC. *Id.* at ¶ 9. The Bankruptcy Court ordered

that the transfer of assets to EAC did not and would not subject it to any liability for claims against Old Castlton. *Id.* These assets were later transferred to Defendant CEC. *Id.* at ¶ 10.

### III. The Present Action and Denial of Summary Judgment

On July 6, 2006, Plaintiffs discovered an oil leak at the Site. Second Am. Compl. at ¶ 34. An investigation determined that the oil leak was caused by a problem with the UST system, which had been installed by Old Castlton as subcontractor for IVI. *Id.* at ¶¶ 36–39, 87, 90. Plaintiffs brought this action against Defendants, as well as other parties, to recover the costs of environmental investigation, removal, remediation, and clean up arising from the oil leak.

In this action, IVI and CEC previously moved for summary judgment to dismiss Plaintiff's Complaint on the basis that in July 2003, the Plaintiffs released all claims against IVI related to IVI's work at the Site. IVI 56.1 St. at ¶ 10. On September 30, 2011, the Court denied Defendants' motions for summary judgment, finding that although "[a]t first glance the language of the Release is clear and unambiguous," the several "Whereas" statements that reference the claims at issue in the State Court Action "imply that, although the Release contains general language releasing the parties from any further liability, the Release was intended to cover the settlement of only those claims at issue in the state court action." *Vornado Realty Trust v. Castlton Envtl. Contractors, LLC* ("*Vornado I*"), No. 08-CV-4823, 2011 WL 4592800, at *4–5 (E.D.N.Y. Sept. 30, 2011) (Irizarry, J.). Accordingly, the Court relied upon extrinsic evidence and ultimately found that "there are issues of material fact improper for determination on summary judgment as to whether the parties intended the Release to apply only to injuries at issue in the State Court Action, and whether the parties intended for the Release to govern services related to both improper design and installation of the UST system." *Id.* at *6.

On October 11, 2011, this matter was reassigned from Judge Dora Irizarry to Judge William F. Kuntz, II. Though Defendants filed motions for reconsideration after the case was reassigned to Judge Kuntz, Judge Irizarry entertained the motions for the sake of judicial economy because they concerned Judge Irizarry's earlier order denying summary judgment. On October 19, 2011, this Court stayed discovery. *See* Dkt. No. 209.

On November 16, 2011, the Court denied Defendants' respective motions for reconsideration. *Vornado Realty Trust v. Castlton Envtl. Contractors, LLC* ("*Vornado II*"), No. 08-CV-4823, 2011 WL 5825688, at *2 (E.D.N.Y. Nov. 16, 2011) (Irizarry, J.). The Court found that it did not err in its previous order denying summary judgment, stating that "[a]lthough the court did not discuss all instances of ambiguity in the Release in its Opinion, it did consider them in its decision." *Id.* Following this statement, the Court discussed instances of ambiguity in the operative language of the Release. *See id.* Specifically, the Court determined it noteworthy that Paragraph Four of the Release "implies that the parties intended the Release to apply only to the claims that were disputed in the state court action." *Id.*

On September 20, 2012, the Court lifted the stay of discovery. *See* Dkt. No. 227.

### IV. Deposition of Joseph Macnow

Joseph Macnow was the signatory of the Release on behalf of AKPC and AKP. IVI 56.1 St. at ¶ 17. When IVI filed its Answer to the First Amended Complaint on January 29, 2009, it attached a copy of the Release, which bore Mr. Macnow's signature. *See* Dkt. No. 29.

In their initial discovery responses, dated March 31, 2009, Plaintiffs did not identify any individuals with information regarding the scope or meaning of the Release. McNulty Decl., Ex. A. Plaintiffs did not identify Mr. Macnow as an individual likely to have information regarding the terms of the Release until it produced supplemental disclosures on March 5, 2013. McNulty

6

Decl., Ex. B at 2–3 ("Mr. Macnow has knowledge of . . . the scope of the Settlement Agreement and Mutual Releases ('Release') dated September 11, 2003, which resolved the prior state court litigation between Plaintiffs [AKPC] and [AKP] and IVI."). Indeed, the only corporate representative or witness identified by Plaintiff's supplemental disclosures as having knowledge or information regarding the Release was Mr. Macnow.

On April 30, 2013, IVI took the deposition of Mr. Macnow. IVI 56.1 St. at ¶ 17. When asked about the scope of the Release, Mr. Macnow testified as follows:

> Q: You agree with me that IVI was giving a release to Alexander's Kings Plaza Center for any and all claims that it had in connection with the Master Agreement and the services that were rendered by IVI at the site, correct?
>
> MR. BARNES: Same objections.
>
> A: I think that's what the words say.
>
> Q: And it was receiving a $90,000 payment in return for giving that full release, correct?
>
> A: Yes.
>
> Q: Okay.
>
> And, in addition to that, Vornado was giving a release to IVI, was it not? When I say "Vornado," Alexander's Kings Plaza was giving a release to IVI, was it not?
>
> MR. BARNES: Same objections.
>
> A: Yes, it was.
>
> Q: And Alexander's Kings Plaza was giving a release of any and all past, present or future claims that it had arising from the agreement that it entered into with IVI, is that right?
>
> MR. BARNES: Same objections.

7

>   Also objection as to form regarding excerpting from the release.
>
> A: That's what it says.
>
> ***
>
> Q: Referring you to paragraph 7 which reads, "The signatories of this release hereby specifically state that they have executed this release voluntarily and are fully aware of the provisions of this release and the ramifications thereof."
>
>   Do you see that?
>
>   MR. BARNES: Same objections.
>
> A: I do see it.
>
> Q: And that was the understanding of Alexander's when they called upon you to execute this agreement on their behalf?
>
>   MR. BARNES: Same objections.
>
> A: It was.

McNulty Decl., Ex. M at 118:5–119:8, 121:14–122:3.

Mr. Macnow also testified as to the parties' intent with respect to any exceptions or carve-outs in the Release so as to allow Plaintiffs to file another lawsuit against IVI for claims arising from the Master Agreement:

> Q: Mr. Macnow, we talked a little bit about the allegations and the claims that were asserted by both IVI and Alexander's in connection with the lawsuit that was filed back in 2002.
>
>   Was it your understanding that based on the Settlement Agreement and Mutual Releases exchanged between the parties, that IVI was agreeing to compromise its claims of $177,000 for unpaid services as well as $326,000 as alleged in the fourth cause of action of its Second Amended Complaint for $90,000?
>
> A: Yes.
>
> Q: And was it also your understanding that by way of the Settlement Agreement of Mutual Release, that Alexander's was agreeing to forego

8

       and compromise its $3 million claim in return for the release it was getting from IVI?

       MR. BARNES: Same objections as before. Calls for speculation. Asked and answered and lack of foundation.

A:    Yes.

Q:    Do you recall ever having any conversations with Mr. Zubcak regarding the settlement and mutual release in which he told you that there were any exceptions or carve-outs that Vornado understood to be part of the settlement it was entering into with IVI?

       MR. BARNES: Same objections as before. And also as to form.

A:    I don't recall.

McNulty Decl., Ex. D. at 125:2–126:3.

### V.    Affidavit of Mario De Stefanis

Mario De Stefanis is the Vice President of IVI and executed the Release on behalf of IVI. Aff. of Mario de Stefanis ("Stefanis Aff.") at ¶¶ 1, 13. According to Mr. De Stefanis, "IVI would never have agreed to the payment terms of the Release without first obtaining a full release of all existing claims asserted against IVI and any future claims that could be asserted against IVI in connection with the work performed under the Master Agreement." *Id.* at ¶ 15.

Mr. De Stefanis' deposition testimony reflects his understanding that the Release would prevent Plaintiffs from bringing any future claims arising out of the Master Agreement:

- "The facts are that we were provided with a full release for Vornado for all the work we've done in this and frankly I'm a little confused why I'm here on that."

- "Not sure after our full release why we're even involved [in this case]."

- "[T]hey're dragging me into something that I've been released from."

- "We've already been provided a release on this thing."

9

- "We had a pay dispute and went back and forth, I liened the property and basically we agreed to go our separate ways with the full release which cost me approximately $90,000 in money."

McNulty Decl., Ex. H at 17:19–22, 50:17–18, 88:10–11, 88:19–20, 150:24–151:4.[2]

## LEGAL STANDARD

Federal Rule of Civil Procedure 54(b) provides that "any order or other decision . . . that adjudicates fewer than all the claims . . . does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." Rule 54(b) gives district courts broad discretion to reconsider, reverse, or modify interlocutory orders previously entered in a case. *See, e.g., Parmar v. Jeetish Imports, Inc.*, 180 F.3d 401, 402 (2d Cir. 1999) ("All interlocutory orders remain subject to modification or adjustment prior to the entry of a final judgment adjudicating the claims to which they pertain.") (citing Fed. R. Civ. P. 54(b)); *Wright v. Cayan*, 817 F.2d 999, 1002 n.3 (2d Cir. 1987) ("[I]t is clear that a second judge has the power to grant summary judgment despite another judge's previous denial of summary judgment."); *Corporacion de Mercadeo Agricola v. Mellon Bank Int'l*, 608 F.2d 43, 48 (2d Cir. 1979) ("The first judge always has the power to change a ruling; further reflection may allow a better informed ruling in accordance with the conscience of the court. A fortiori, if the first judge can change his mind after denying summary judgment and change his ruling, a second judge should have and does have the power to do so as well."); *Williams v. County of Nassau*, 779 F. Supp. 2d 276, 280 (E.D.N.Y. 2011) (Mauskopf, J.) ("A district court retains absolute authority to reconsider or otherwise affect its interlocutory orders any time prior to appeal.").

---

[2] This citation is to the first of the two McNulty Declarations.

10

However, "[e]ven if Rule 54(b) allows parties to request district courts to revisit earlier rulings, the moving party must do so within the strictures of the law of the case doctrine." *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992). "The law of the case doctrine is admittedly discretionary and does not limit a court's power to reconsider its own decisions prior to final judgment." *Id.* (citations omitted). But "where litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again." *Id.* (citation and internal quotation marks omitted). "The major grounds justifying reconsideration are 'an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.'" *Id.* (quoting 18 C. Wright, A. Miller & E. Cooper, *Federal Practice & Procedure* § 4478 at 790). "The objective of the law of the case doctrine includes promoting efficiency and avoiding endless litigation by allowing each stage of the litigation to build on the last and not afford an opportunity to reargue every previous ruling." *McGee v. Dunn*, No. 09 Civ. 6098, 2013 WL 1628604, at *3 (S.D.N.Y. Apr. 16, 2013) (Stamp, J.) (internal editing and quotation marks omitted).

"[B]ecause the denial of a motion for summary judgment is an interlocutory order, the trial court is free to reconsider and reverse its decision for any reason it deems sufficient, even in the absence of new evidence or an intervening change in or clarification of the substantive law." *Nabisco v. Warner-Lambert Co.*, 32 F. Supp. 2d 690, 694–95 (S.D.N.Y. 1999) (Motley, J.) (quoting *Lavespere v. Niagara Machine & Tool Works, Inc.*, 910 F.2d 167, 185 (5th Cir. 1990)), *aff'd* 220 F.3d 43 (2d Cir. 2000); *see also Jacques v. DiMarzio*, 200 F. Supp. 2d 151, 163–64 (E.D.N.Y. 2002) (Block, J.) (quoting *Nabisco*, 32 F. Supp. 2d at 694); *Jackson v. Roach*, 364 F. App'x 138, 139 (5th Cir. 2010) ("[T]he denial of a motion for summary judgment is an

11

interlocutory order, which the trial court may reconsider and reverse for any reason it deems sufficient.").

## DISCUSSION

### I. The Release Extends to Plaintiffs' Claims Against IVI in This Action

The Court concludes that it must reverse the September 30, 2011 and November 16, 2011 decisions of this Court to prevent manifest injustice. Those earlier decisions rested on the Court's finding that the Release was ambiguous as to whether it applied only to the specific claims and counterclaims at issue in the State Court Action or whether the parties intended to release any and all past, present, and future claims arising from IVI's work at the Site. This Court now finds that the broad language of the Release is unambiguous. The language of the Release is clear, and it would be a manifest injustice to deprive IVI of the benefit of the bargain it struck with Plaintiffs to settle the State Court Action. Therefore, to prevent manifest injustice, the Court grants summary judgment to IVI.

"Where a contract is clear and unambiguous on its face, the intent of the parties must be gleaned within the four corners of the instrument, and not from extrinsic evidence." *RJE Corp. v. Northville Indus. Corp.*, 329 F.3d 310, 314 (2d Cir. 2003) (citations and internal quotation marks omitted); *see also Appel v. Ford Motor Co.*, 111 A.D.2d 731, 732, 490 N.Y.S.2d 228 (N.Y. App. Div. 2d Dep't 1985) (where a valid release is "clear and unambiguous on its face" and is "knowingly and voluntarily entered into," it "will be enforced as a private agreement between [the] parties"). "Whether a contract is ambiguous is a question of law." *RJE Corp.*, 329 F.3d at 314. The terms of a contract are not ambiguous if they "have a definite and precise meaning and are not reasonably susceptible to differing interpretations." *Id.* (citations and internal quotation marks omitted). If the court determines that an agreement is ambiguous, it

"may resort to extrinsic evidence to determine the parties' intent," "so long as the evidence is not inconsistent with the express terms of the contract." *Golden Pac. Bancorp v. F.D.I.C.*, 273 F.3d 509, 517 (2d Cir. 2001). However, "when the meaning of a contract is plain and clear, it is entitled to be enforced according to its terms and not to be subverted by straining to find an ambiguity which otherwise might not be thought to exist." *Uribe v. Merchants Bank of N.Y.*, 91 N.Y.2d 336, 341, 693 N.E.2d 740 (1998) (citation, internal quotation marks, and editing omitted).

When a release is executed "in a commercial context by parties in roughly equivalent bargaining positions and with ready access to counsel, the general rule is that if 'the language of the release is clear . . . the intent of the parties [is] indicated by the language employed.'" *Consorcio Prodipe, S.A. de C.V. v. Vinci, S.A.*, 544 F. Supp. 2d 178, 189 (S.D.N.Y. 2008) (Castel, J.) (quoting *Locafrance U.S. Corp. v. Intermodal Sys. Leasing, Inc.*, 558 F.2d 1113, 1115 (2d Cir. 1977)); *see also Kay-R Elec. Corp. v. Stone & Webster Const. Co., Inc.*, 23 F.3d 55, 58 (2d Cir. 1994) ("The law of New York states that where the language with respect to the parties' intent is clear and unambiguous, it will be given effect, regardless of one party's claim that he intended something else.") (citation, internal quotation marks, and editing omitted). And when general language is used in the releasing document, "the release is to be construed most strongly against the releaser." *Middle E. Banking Co. v. State Street Bank. Int'l*, 821 F.2d 897, 907 (2d Cir. 1987). "[T]he burden is on the releaser to establish that the release should be limited." *Id.*

General releases are sometimes "avoided with respect to uncontemplated transactions despite the generality of the language in the release form." *Mangini v. McClurg*, 24 N.Y.2d 556, 562 (1969). However, the New York Court of Appeals has cautioned against setting aside a general release simply because it might preclude an action based on unrelated transactions:

13

> This is not to say that a release may be treated lightly. It is a jural act of high significance without which the settlement of disputes would be rendered all but impossible. It should never be converted into a starting point for renewed litigation except under circumstances and under rules which would render any other result a grave injustice. It is for this reason that the traditional bases for setting aside written agreements, namely, duress, illegality, fraud, or mutual mistake, must be established or else the release stands.

*Id.* at 563. Indeed, the *Mangini* court emphasized that even in the case of a mutual mistake between the settling parties as to the existence of an unknown injury, "there are many reasons, including doubtful liability, the willingness to take a calculated risk, the desire to obtain an earlier rather than a later settlement, and perhaps others, why releasers may wish to effect a settlement and intend to give the release a discharge of liability for any unknown injuries—in short to bargain for general peace. When general peace is the consideration there can be no mutual mistake as to the extent of the injuries, known or unknown." *Id.* at 566.

The Court concludes the Release is clear and unambiguous. Therefore, the Court must glean the parties' intent from the four corners of the document. Paragraph Three of the Release expressly released IVI from "all actions, causes of action, [or] suits . . . whatsoever," which Plaintiffs "now have or hereafter can, shall or may, have for, upon, or by reason of any matter, cause or thing arising from or relating to services rendered by IVI . . . in connection with the Kings Plaza Shopping Center." McNulty Decl., Ex. F. Paragraph Six of the Release states the Release is "intended to, and does finally and fully terminate and dispose of all claims which have been or *may be asserted* at law or equity arising from or relating to the services rendered by IVI . . . in connection with the Kings Plaza Shopping Center." *Id.* (emphasis added). The Release contains no language excepting claims based on faulty installation of the USTs from the scope of the agreement. *See, e.g., Northgate Electric v. Barr & Barr*, 61 A.D.3d 467, 468, 877 N.Y.S.2d 36 (N.Y. App. Div. 1st Dep't 2009) ("If a plaintiff had wished to except its delay claim from the

14

release, it should have included plain language to that effect in the release."). Regardless of whether or not Plaintiffs were aware of problems with the installation of the USTs at the time they executed the Release, and keeping in mind that a general release "is to be construed most strongly against the releaser," *Middle E. Banking Co.*, 821 F.2d at 907, the unambiguous language of the Release shows the parties intended to bargain for general peace.[3] Accordingly, the Court grants summary judgment in favor of IVI.

Contrary to the findings of the previous interlocutory orders, this Court concludes the Release is not rendered ambiguous by the introductory "Whereas" statements or by Paragraph Four. While it is true that general words of release are sometimes "limited by the recital of a particular claim," *Green v. Lake Placid 1980 Olympic Games*, 147 A.D.2d 860, 862, 538 N.Y.S.2d 82, 84 (N.Y. App. Div. 3d Dep't 1989), the mere recitation of the specific claims underlying a settlement will not undermine the broad prophylactic effect of general release language. Thus, in *Green*, the court found a general release was limited to a payment dispute under a contract and did not extend to a dispute under a different contract because, contrary to the facts in this case, the release referenced the specific claim at issue, the releasing party's attorney had not reviewed the release prior to execution, and the defendants' attorney had told a representative of the plaintiffs that the settlement would not affect the second action. *Id.* at 862. The other cases cited by Plaintiffs are similarly distinguishable as involving releases arising from disputes unrelated to later litigation. *See Gettner v. Getty Oil Co.*, 226 A.D.2d 502, 641 N.Y.S.2d 73 (N.Y. App. Div. 2d Dep't 1996) (general release arising from payment dispute did not extend to later action based on alleged environmental damage); *Perritano v. Town of*

---

[3] While the Court does not rely on extrinsic evidence in its reading of the unambiguously worded contract, the Court notes that the deposition testimony of Mr. Macnow and Mr. De Stefanis, the signatories who executed the Release on behalf of the parties, is consistent with the Court's conclusion that the Release covers any and all claims arising from IVI's work at the Kings Plaza Shopping Center.

15

*Mamaroneck*, 126 A.D.2d 623, 511 N.Y.S.2d 60 (N.Y. App. Div. 2d Dep't 1987) (general release arising from defamation suit did not necessarily extend to unrelated contract claims).

Unlike in *Green*, the State Court Action and the present dispute both arose from IVI's work under a single contract. Unlike in *Gettner*, the State Court Action did not involve a mere payment dispute. Plaintiffs lodged counterclaims against IVI for breach of contract, negligence, malpractice and conversion arising from IVI's work at the Kings Plaza Shopping Center. As such, the "Whereas" statements and Paragraph Four of the Release did not limit the Release to the specific claims and counterclaims in the State Court Action. Instead, because Plaintiffs' counterclaims in the State Court Action arose from IVI's work at the Kings Plaza Shopping Center, the general language of the Release is more properly understood as striking a global peace between the parties with the intent that all parties could move forward knowing there would be no further disputes arising from IVI's services at the Site.

## II. CEC Is Also Entitled to Summary Judgment as an Agent of IVI

Because the Release expressly applies to IVI's agents, and because Old Castlton was an agent of IVI, CEC is also entitled to summary judgment.[4] Plaintiffs argue Old Castlton was not IVI's agent by pointing to an unsigned agreement between IVI as general contractor and Old Castlton as sub-contractor, which disclaims the existence of an agency relationship between the two. Pls.' Br. at 25–26; Barnes Decl., Ex. F. However, for the reasons set forth below, the Court rejects Plaintiffs' argument and concludes Old Castlton was IVI's agent, entitling it to the protections of the Release.

---

[4] The Court's September 30, 2011 interlocutory decision concluded there were genuine issues of material fact as to whether CEC is a successor in interest to Old Castlton. For the sake of this motion, the Court assumes CEC is a successor in interest to Old Castlton, exposing it to liabilities attached to assets purchased in the bankruptcy sale of Old Castlton's assets.

16

### A. The Unsigned Agreement Is Not Binding

To determine whether an unsigned agreement constitutes a binding contract between two parties, courts in the Second Circuit consider the following factors: "(1) whether there is an expressed reservation of the right not to be bound in the absence of a writing; (2) whether there has been partial performance of the contract; (3) whether all of the terms of the alleged contract have been agreed upon; and (4) whether the agreement at issue is the type of contract that is usually committed to writing." *Brown v. Cara*, 420 F.3d 148, 154 (2d Cir. 2005).

The first factor is "frequently the most important." *Id.* The cover page of the unsigned agreement between IVI and Old Castlton directs a representative of Old Castlton to "sign the enclosed Contract Agreement form and mail the original copy back to our office." Barnes Decl., Ex. F. The signature page similarly requests Old Castlton to "acknowledge acceptance of the terms and conditions of this Contract Agreement by signing and returning to us an original copy." *Id.* Despite this repeated language, the agreement does not contain any signatures acknowledging acceptance of the terms and formation of a contract. Furthermore, the signature page states the agreement "represents the entire agreement between IVI and the CONTRACTOR, supersedes all prior agreements and understandings, and may be changed only by written amendment executed by both parties." *Id.* Paragraph Nine of the unsigned agreement contains a similar clause, stating "[t]he terms, instructions and conditions on the face and in the body of this Contract Agreement . . . constitute the entire agreement between the parties hereto and any modification of this Contract Agreement to be valid must be in writing and signed by the Construction Manager's authorized representative." *Id.* "The presence of such a merger clause is persuasive evidence that the parties did not intend to be bound prior to the execution of the written agreement." *Nat'l Gear & Piston, Inc. v. Cummins Power Sys.*, 861 F. Supp. 2d 344, 357

(S.D.N.Y. 2012) (Karas, J.) (quoting *Ciaramella v. Reader's Digest Ass'n, Inc.*, 131 F.3d 320, 324 (2d Cir. 1997)); *see also R.G. Grp., Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 76 (2d Cir. 1984) (clause stating that "any modification in the agreement would also have to be in writing and signed" indicated the parties did not intend to be bound prior to execution of the contract). Taken together, these provisions demonstrate a clear intent to be bound only once the agreement was signed by both parties. *See Cummins Power*, 861 F. Supp. 2d at 357.

The record is sparse as to the three remaining factors. However, as noted earlier, the first factor is frequently the most important. Indeed, "the second factor of partial performance is not dispositive, and in some cases it is given little weight." *Id.*; *see also United States v. U.S. Currency in the Sum of $660,200*, 423 F. Supp. 2d 14, 28 (E.D.N.Y. 2006) (Azrack, M.J.) (noting "it is the second factor that appears to have had the least sway with courts"). As to the third factor, though there is no indication that there were any terms yet to be agreed upon, that fact "does not foreclose a holding that a proposed agreement is unenforceable because the parties did not intend to be bound until it was in writing and signed." *Cummins*, 861 F. Supp. 2d at 358. Likewise, even assuming the unexecuted agreement between IVI and Old Castlton is the sort of contract that is usually committed to writing and signed as a matter of industry custom, that would not outweigh the "first and most important factor," which "looks to the language of the preliminary agreement for indication whether the parties considered it binding or whether they intended not to be bound until the conclusion of final formalities." *Teachers Ins. & Annuity Ass'n of Am. v. Tribune Co.*, 670 F. Supp. 491, 499 (S.D.N.Y. 1987) (Leval, J.). Because the unsigned agreement between IVI and Old Castlton contains no indication of Defendants' intent for the agreement to become operative absent formal execution, the Court concludes the agreement does not support Plaintiff's argument that Old Castleton disclaimed an agency

18

relationship with IVI. *See Cummins*, 861 F. Supp. 2d at 358 ("[T]he language of the Agreement makes clear that Defendants did not intend to be bound until the Agreement was executed, and Plaintiff has not offered plausible allegations to the contrary.").

## B. Old Castlton Was the Agent of IVI

As the record does not reflect a binding written agreement defining the nature of the relationship between IVI and Old Castlton, the Court must determine whether an agency relationship existed through the parties' conduct. In New York, an agency relationship requires the following elements: "(1) manifestation by the principal that the agent shall act for him; (2) the agent accepted the undertaking; and (3) an understanding between the parties that the principal is to be in control of the undertaking." *Spagnola v. Chubb Corp.*, 264 F.R.D. 76, 89 (S.D.N.Y. 2010) (Baer, J.). "The consent necessary for actual authority may be 'either express or implied from the parties' words and conduct as construed in light of the surrounding circumstances.'" *Id.* (citation omitted).

Based on the record, no reasonable jury could fail to conclude that Old Castlton was the agent of IVI. According to the Master Agreement between Plaintiffs and IVI, IVI had authority to remove and replace USTs at the Site. McNulty Decl., Ex. A at 8.[5] Pursuant to the Master Agreement, IVI was to provide all labor and materials to design and install the new USTs. *Id.* IVI had "sole discretion to assign portions of [the Master Agreement] to subcontractors," and the parties agreed to indemnify each other for injuries caused by the negligence or willful misconduct of their respective agents, employees, or subcontractors. *Id.* at 11. IVI, which had primary responsibility for the installation of the USTs as the general contractor, subcontracted at least some of that work to Old Castlton. *See* Second Am. Compl. at ¶¶ 28–29 ("Defendants IVI and Castlton designed and installed a new UST system"), 87–88 ("IVI hired Castlton to install

---

[5] This citation is to the first of the two McNulty Declarations.

19

four new 15,000 gallon fuel oil underground storage tanks and associated piping at the Site."), 90 ("The negligent acts and omissions by IVI, its agents, employees and subcontractors, including Defendant Castlton, were the cause of Plaintiffs' damages."); CEC 56.1 St. at ¶ 1. Hence, there are no genuine issues of material fact as to whether an agency relationship existed between IVI and Old Castlton. IVI manifested intent to grant authority to Old Castlton to help design and install the USTs, Old Castlton accepted such authority, and IVI retained control over key aspects of the undertaking. *See Spagnola*, 264 F.R.D. at 89. Because Old Castlton was an agent of IVI, Old Castlton fell within the protections of the Release, and CEC, as successor-in-interest, cannot be held liable in this action.

## CONCLUSION

For the reasons stated above, Defendants' renewed motions for summary judgment are granted in their entirety. All claims against Defendants are dismissed with prejudice. The Clerk is directed to enter judgment for Defendants in accordance with this Decision and Order and to close the case.

## SO ORDERED

Dated: Brooklyn, New York
December 18, 2013

s/WFK

HON. WILLIAM F. KUNTZ, II
United States District Judge